**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STEPHEN A.M.,[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 3:21-CV-00020-MAB** |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and supplemental security income (SSI) pursuant to 42 U.S.C. § 423.[2]

## Procedural History

Plaintiff applied for DIB and SSI on February 11, 2016 and February 8, 2016, respectively, alleging in both a disability onset date of June 24, 2015 (Tr. 170; 153; 304; 310). Plaintiff's date of last insured (DLI) is December 31, 2015, which means that he must establish that he is disabled on or before this date to be eligible for DIB. Plaintiff's original application was initially denied on October 18, 2018 after a hearing was conducted in

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 10).

front of Administrative Law Judge ("ALJ") Michael S. Worrall (Tr. 72-108; 15-30). The Appeals Council denied his request for review, so Plaintiff appealed to this Court (Tr. 1-3; 868-69). On February 19, 2020, this Court reversed the ALJ's decision and remanded the case for further proceedings (Tr. 882-99). On May 19, 2020, the Appeals Council issued an Order remanding the case to the ALJ, along with consolidating his subsequently filed claims for DIB and SSI on June 7, 2019 along with Plaintiff's 2016 claims (Tr. 902). ALJ Worrall held a second hearing on August 26, 2020 (Tr. 804-36). ALJ Worrall issued a partially favorable decision on October 7, 2020, finding Plaintiff disabled, but not until October 1, 2020, which had the effect of granting a minimum award of SSI benefits, but denying Plaintiff's DIB claim completely (Tr. 769-94). The ALJ's decision became administratively final on the 61st day following the notice (Tr. 766). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following two, related issues:

1. The ALJ failed to properly evaluate Plaintiff's seizure disorder and migraine headaches under Listing 11.02 at step 3 in his analysis; and

2. The ALJ failed to properly evaluate Plaintiff's Residual Functional Capacity ("RFC"), specifically failing to fully account for Plaintiff's seizure disorder and migraine headaches in the RFC.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the

applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The

---

[3]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not engaged in substantial gainful activity since June 24, 2015, Plaintiff's first onset date (Tr. 772).

Plaintiff was born on December 30, 1970 and was 45-years old on the disability onset date (Tr. 792). The ALJ found that Plaintiff had severe impairments of seizure disorder, migraine headaches, lumbar degenerative joint disease, mild cervical spine degenerative disc disease, mild left knee osteoarthritis, mood disorder, anxiety disorder,

and schizophrenia (Tr. 772). The ALJ concluded that these impairments did not meet or equal a listed impairment.

The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §404.1567(b) as follows:

> Claimant has the residual functional capacity to perform a mixed range of the physical exertional demands of light and sedentary work…He can lift and carry 20 pounds occasionally and 10 pounds frequently. He can sit for six hours in an eight-hour workday, and he can stand and/or walk for two hours in an eight-hour workday. He can occasionally push and pull with bilateral lower extremities. He can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. He can occasionally kneel, crouch, and crawl. He can frequently stoop. He should avoid concentrated exposure to extreme cold, noise, or vibration. He should avoid concentrated exposure to work at unprotected heights, around dangerous moving machinery, or operating a motor vehicle as part of his job duties. On a sustained basis, the claimant can understand, remember, and carry out simple, routine, repetitive tasks requiring only simple work-related decisions with few changes in the routine work setting. He can maintain concentration, persistence, and pace sufficient for work with a variable pace or end-of-day production goals, but not for fast-paced work such as work at a moving conveyer belt. He can occasionally interact with supervisors and coworkers. He should not interact with the public as part of his job duties. His job duties should primarily involve working with things rather than with people.

(Tr. 778-79).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff was unable to perform past relevant work (Tr. 790). Ultimately, the ALJ found Plaintiff was not disabled prior to October 1, 2020, but became disabled on that date through the date of the ALJ's decision (Tr. 793-94.).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing

this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

### 1.    Evidentiary Hearing

At the time of the August 26, 2020 hearing, Plaintiff was 49-years old and a few months away from turning 50 (Tr. 792, 804, 810-11). Plaintiff was represented by an attorney at the hearing (Tr. 806).

The ALJ questioned Plaintiff, although Plaintiff's attorney asked most of the questions (Tr. 811-824). Plaintiff indicated that his highest level of education was the ninth grade and he did not get his GED (Tr. 811). He further explained that he currently lives alone in a mobile home with two dogs and one cat (Tr. 812). Plaintiff uses a cane and knee braces, which he first identified in an Adult Function Report he completed when he initially applied for disability (Tr. 812-13). He further explained that he consulted his doctor, Dr. Hanson, about using a cane "several years" before the hearing (Tr. 813). Plaintiff requires a cane because he has knee and back pain when he walks. *Id.* Plaintiff testified that he needs his cane "just about everywhere" he goes, including when he goes to the grocery store, doctors' appointments, or even just to stand up to pick up a book (Tr. 824).

As for knee braces, Dr. Hanson had to fill out paperwork for Plaintiff to use the braces and he has been using them for (approximately) the five years preceding the hearing (Tr. 813-814). Because of his knee and back issues, as well as walking with braces and a cane, Plaintiff described only being able to walk five to ten minutes at a time (Tr. 814).

Plaintiff also described having visual and auditory hallucinations, including seeing a black figure with red eyes in his home (Tr. 814). He also sees a figure of a woman in his yard, but when he opens the window, she disappears (Tr. 815). Plaintiff takes a series of medications including Guanfacine, Abilify, Effexor, and Clonazepam, and yet still sees the dark figure "at least once or twice a day" (Tr. 815). As for the auditory hallucinations, Plaintiff explained he hears his mother talking to him, telling him to kill himself so he can be with her. He also hears whispering in his ear, but he usually cannot "make out what they're saying" (Tr. 815). On average, Plaintiff testified he experiences auditory hallucinations three to four times a day (Tr. 815).

Plaintiff testified feeling suicidal, and his medications sometimes help, but only to a "certain extent" (Tr. 816). He also cannot lift heavy objects, which he defined as anything over ten pounds (Tr. 816). Plaintiff has difficulty getting dressed, bathing, and shaving because of the pain in his back and neck (Tr. 817). For example, he will shave one side of his face and then lay down for 5-10 minutes before finishing (Tr. 817). Furthermore, Plaintiff cannot drive, as his license was taken away due to his seizures (Tr. 818). To get to and from doctor appointments, Plaintiff relies on family and friends to drive him (Tr. 818). Plaintiff testified he has issues getting along with other people, particularly men, which he works on with his counselor (Tr. 818-819). He cannot prepare his own meals, so he mainly gets things he can heat up in the microwave, as he has a fear that he will have a seizure while cooking and start a fire (Tr. 820). Plaintiff does his own laundry in his home and he also does his own grocery shopping (Tr. 820). To get to the grocery store, friends or family drive him (Tr. 821). Plaintiff testified that he sees family

and friends on a fairly regular basis (Tr. 821).

Plaintiff testified that, on average, he has one to three seizures a month (Tr. 822). His seizure frequency has reduced, though, due to an increase in his medication (Tr. 822). Plaintiff takes Keppra and Depakote for his seizures (Tr. 823). These medications cause Plaintiff to become sleepy and dizzy (Tr. 823). When Plaintiff is on these medications, he usually falls asleep for one to three hours per day (Tr. 823). Plaintiff used to play the guitar, but cannot anymore because his hands shake too much (Tr. 824-825). He was prescribed Gabapentin for his hands, which helps, but does not take care of the whole problem (Tr. 825). Plaintiff testified that he sees his counselor every week and at the time of the hearing, had been seeing his counselor for a little over three years (Tr. 826).

A VE also testified at the hearing and the VE indicated his testimony was consistent with the DOT (Tr. 830; 835). The VE assessed Plaintiff's prior work as a production supervisor (DOT number 183.167-018) as being highly skilled with a Specific Vocational Preparation ("SVP") level of 8.[4] Generally, this position is defined as light exertional work, but as Plaintiff performed the job, it was at "the very heavy physical demand level" (Tr. 831). The VE assessed Plaintiff's prior work as a Department Manager

---

[4] Specific vocational preparation, or "SVP", is the amount of time required for a typical claimant to learn the techniques, acquire the information, and develop the facility needed for average performance in a job. A claimant may acquire SVP in a school, military, institutional, or vocational environment through such settings as: vocational training, apprenticeship training, in plant training, on-the-job training, and essential experience in other jobs. For example, a registered nurse has an SVP of seven, which means that a claimant can learn this job in about 2-4 years. If the job is assessed as an SVP of 1, it means that only a short duration is needed to learn the job. In this case, an 8 means that it would take over 4 years and up to 10 years to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed September 28, 2022).

(DOT number 189.167-018) as a skilled job with an SVP of 6[5] (Tr. 831). Similarly, the DOT defines this role as having a light physical demand level, but as performed by the Plaintiff, a "very heavy physical demand level" is more appropriate (Tr. 831).

The VE was questioned about a hypothetical individual, age 40, that has a ninth-grade education and the same past work as Plaintiff. This hypothetical person can lift and carry 20 pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; stand or walk only two hours in an eight-hour workday; occasionally push and pull with bilateral lower extremities; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally kneel, crouch, or crawl; and frequently stoop. Additionally, this hypothetical person should avoid concentrated exposure to extreme cold, noise, or vibration; concentrated exposure to work at unprotected heights; and being around dangerous moving machinery, or the operation of a motor vehicle as part of their job duties. This person can perform the basic mental demands of unskilled work on a sustained basis; can understand, remember, and carry out simple, routine, and repetitive tasks requiring only simple work-related tasks with few changes in a routine work setting; maintain concentration, persistence, and pace sufficient for work with a variable pace or end of day production goal, but not for fast paced work such as work on a moving conveyer belt; occasionally interact with supervisors and coworkers; should not interact with the public as part of the job duties; and their job duties should primarily

---

[5] An SVP of 6 means that it would take over 1 year and up to 2 years to learn the job. *SEE here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed September 28, 2022).

involve working with things rather than with people (Tr. 832).

The ALJ asked the VE if this hypothetical person could complete Plaintiff's past work, and the VE responded that this person could not perform Plaintiff's past work (Tr. 834). But the VE testified that this person could do some work at the sedentary level, including that of an Assembler (DOT 706.684-030) with an SVP of 2 and 11,000 jobs nationally (Tr. 833). Additionally, this hypothetical person could perform the job of an inspector (DOT 669.687-014) with an SVP of 2 and 37,000 jobs nationally. Finally, this person could perform the job of Final Assembler (DOT 713.687-018) with an SVP of 2 and 11,000 jobs nationally (Tr. 833). The VE further testified that if the hypothetical person had to use a cane for walking or balancing, it would not impact their ability to perform these sedentary jobs (Tr. 834). With that said, if this person needed to lay down once a day for 1-3 hours, there would be no jobs available according to the VE (Tr. 834). There would also be no jobs if this person had to be off task 15% or more of the workday and if this person needed to miss work on average two times a month, or more, due to the need for medical treatment or therapy (Tr. 834).

Plaintiff's attorney questioned the VE, and asked if there are any jobs for the hypothetical person if they add that this person is unable to accept instructions and respond appropriately to criticism from supervisors at least one-third of the workday and workweek (Tr. 835). The VE testified that this hypothetical person would not have any jobs available to them with that additional description (Tr. 835).

### 2.    Relevant Medical Records

Plaintiff submitted medical records to aid the ALJ in her determination. The

following medical records are focused on Plaintiff's claims relating to his migraines and seizures dating back to around 2014.

Plaintiff submitted medical records from SIH Brain & Spine Institute dated September 22, 2014 through February 4, 2016 (Tr. 451-499). These records indicate that Plaintiff's generalized tonic-clonic seizures are "recurrent" (Tr. 451; 454). At times, the medical records indicate that Plaintiff's medications aggravate his symptoms (Tr. 459). At times, Plaintiff's seizure symptoms are "incapacitating" and "occur randomly" (Tr. 477). There are also medical notes dated in 2015 that indicate that Plaintiff is no longer driving due to his symptoms (Tr. 486).

Additionally, there are records from Plaintiff's doctor at the time of the hearing. Dr. Hanson (Tr. 500-540). Dr. Hanson indicates she first examined Plaintiff in 2008 and that he has seizures approximately once a month (Tr. 500-501). Dr. Hanson recorded in Plaintiff's medical records on December 5, 2018 that Plaintiff's migraines are a "recurrent problem" that occurs "intermittently" and causes throbbing pain (Tr. 1482).

Plaintiff also submitted medical records from St. Joseph Memorial Hospital regarding his seizures and headaches (Tr. 575-587; 628-678). For example, Plaintiff went to Memorial Hospital of Carbondale on February 26, 2016 for complaints of a headache, where an MRI was conducted (Tr. 582-584).

Included in Plaintiff's medical records is Plaintiff's own log of his seizures, which he presumably shared with his providers. According to Plaintiff, from 2013 through September 2016, he had a total of 60 seizures over the course of those four years, which averages to around 1-2 per month for four years (Tr. 575).

Even in plaintiff's medical records regarding a skin cancer issue, the doctors note that Plaintiff has a diagnosis of epilepsy as of November 16, 2015 and migraines as of August 5, 2014 (Tr. 1513). At a February 20, 2019 appointment, Plaintiff was treated for his migraines, as he explained he was still having 2-3 a week (Tr. 1527). The medical notes indicate that Plaintiff's migraines are a recurrent problem that started more than a year before this visit (Tr. 1529). The pain is reported as throbbing which causes neck pain and nausea (Tr. 1529). He was referred to neurology (Tr. 1529).

In March 2019, Plaintiff was examined for his migraines and seizures through an MRI (Tr. 1464). The medical notes indicate that Plaintiff has been suffering from seizures and migraines for four years. The findings "may represent chronic changes of migraine headaches versus early microvascular ischemic changes" (Tr. 1466).

Also in March 2019, Plaintiff saw his doctor for his migraines and seizures. He explained that his migraines occur 1-3 times a week and can last up to 24 hours (Tr. 1831). Additionally, he reports that he has seizures 1-3 times monthly. *Id*. His seizures last a few minutes, with him foaming at the mouth and unable to control his bladder and bowels (Tr. 1831). Plaintiff reported that he "thinks his seizures have become less frequent since the introduction" of two new medications (Tr. 1832). Plaintiff was seen again in April 2019 for a follow-up, during which Plaintiff explained that he is still having seizures, but he believes they are less frequent (Tr. 1834). Additionally, he is having headaches several times a month (Tr. 1835). As a result of continuing symptoms, his medical provider put him on Depakote and tapered off Dilantin (Tr. 1835).

Plaintiff returned in June 2019 and explained that "he is doing better with his

seizures and also not having as many migraines" (Tr. 1837). When Plaintiff returned in September 2019, he reported having 1 migraine from June to September and 2 seizures (Tr. 1838). His doctor notes that he cannot drive. *Id.*

Plaintiff returned to the doctor on January 20, 2020 (Tr. 1093). At this visit, Plaintiff detailed that his "migraines have been better controlled…reports only a few a month" (Tr. 1093). Additionally, he reported having two seizures recently on December 30 and January 9 prior to this January 20 visit (Tr. 1093).

3.    **Agency Forms**

Plaintiff filled out a Function Report in support of his first application for benefits dated March 25, 2016 (Tr. 360). In this report, he explains that he cannot drive because his driver's license was suspended due to his seizures and he also suffers from migraines, among his other ailments not at the center of the analysis presently before the Court (Tr. 353). He further explained that his medications make him very sleepy, so he sleeps a lot during the day (Tr. 354). He needs help from his wife to bathe and shave (Tr. 354). He doesn't cook because of his seizures, as he is afraid he will start a fire and/or get burned if he has a seizure while cooking (Tr. 355).

Plaintiff's family (wife and two children) submitted third-party Function Reports in support of his application. Plaintiff's wife explained that Plaintiff has trouble working due to physical pain and if she has to take him somewhere, he has to wear sunglasses because the "light will mess with him and cause seizures" (Tr. 362). She also explained that he used to be able to do "everything," but cannot do anything (*e.g.*, work, cook, mow, shop, work on our car) due to his conditions (Tr. 363). Additionally, Plaintiff's seizures

sometimes keep him up at night (Tr. 363). She pointed out that Plaintiff will not cook because he is scared of having a seizure and causing a fire (Tr. 364). She also filled out a seizure description form, in which she indicates that Plaintiff has more than one seizure a month on average and she has witnessed so many she has "lost count" (Tr. 371).

Plaintiff's son, David Moore, also filled out a seizure description form, and detailed that Plaintiff has more than one seizure per month that last around 1-2 minutes a piece, with Plaintiff shaking and jerking (Tr. 372). Plaintiff's daughter, Haley Moore, also filled out a seizure description form and detailed the same frequency and intensity of seizures as her mother and brother (Tr. 373).[6]

Lastly, Plaintiff's friend, Charles Hawkins, also submitted a seizure description form. He explained that he has witnessed two of Plaintiff's seizures and Plaintiff's seizures occur, on average, more than once per month (Tr. 389). Like Plaintiff's family, Mr. Hawkins detailed that Plaintiff can sometimes sense a seizure before it starts, but at other times, there are no warnings (Tr. 389).

### 4. State Agency Consultants' Opinions

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from prior administrative findings at Plaintiff's initial stages of applying for benefits. Additionally, the ALJ considered evaluations that occurred as part of the reconsideration after this case was remanded from this Court.

Plaintiff's treating physician, Dr. Emily Hanson, D.O., filled out a seizure disorders

---

[6] Plaintiff's family also submitted additional forms at later dates in which they reiterate much of the same information as these original forms. *See* Tr. 390-391.

questionnaire dated February 28, 2016 (Tr. 500-504). In this form, Dr. Hanson indicates that Plaintiff has a diagnosis of epilepsy and takes Phenytoin and Keppra for this condition (Tr. 500). Even though Plaintiff is compliant with this medication, Dr. Hanson indicated that Plaintiff's seizures are still not controlled and occur monthly (Tr. 500). Dr. Hanson sees Plaintiff every 1-2 months for care (Tr. 501).

Howard Tin, Psy. D., evaluated Plaintiff on August 9, 2016 (Tr. 152-168; 169-178). In this evaluation, Dr. Tin indicated that Plaintiff was filing for disability due to uncontrolled seizure disorder, migraine headaches, chronic obstructive pulmonary disease, post-traumatic stress disorder, anxiety, degenerative disk disease in the spine, spinal stenosis, and arthritis in both hips and knees (Tr. 153). Dr. Tin noted that Plaintiff has about 1 seizure per month, during which he twitches, lights flash, and then he loses consciousness (Tr. 157). After the seizure, Plaintiff is lethargic and incontinent (Tr. 157). Additionally, Plaintiff sees Dr. Hanson for migraine care, which he said have been worsening since he started new medication (Tr. 157). Dr. Tin ultimately determined that Plaintiff is not disabled (Tr. 167).

Lionel Hudspeth, Psy. D., also evaluated Plaintiff on November 21, 2016 (Tr. 184-206; 207-222). Dr. Hudspeth indicated that Plaintiff was being evaluated for uncontrolled seizure disorder and migraines, as well as many other conditions (Tr. 185). Dr. Hudspeth conducted a consultative examination with Plaintiff, and recorded that Plaintiff generally reports around one seizure per month, but that the frequency can increase due to stress, lights (like watching tv, and other factors (Tr. 193)). At the consultative exam, Plaintiff reported having migraines three times per week with a seven out of ten severity level (Tr.

193). He also found Plaintiff to not be disabled (Tr. 205).

Paul Carter, M.D., provided a treating psychiatrist medical source statement on February 28, 2018 (Tr. 759-764). In this report, Dr. Carter indicated that Plaintiff's impairments and/or treatment would cause him to be absent more than four days per month (which is the longest period allowed for on the form) (Tr. 764). He also explained that Plaintiff struggled to meet competitive standards in a number of areas, like maintaining regular attendance; maintaining attention for two hour segments; and performing at a consistent pace, for example (Tr. 762).

Plaintiff's treating physician, Dr. Emily Hanson, D.O., filled out a physical RFC Assessment dated March 5, 2018 (Tr. 754-758). In this assessment, Dr. Hanson indicates that she has seen Plaintiff every 1-3 months since 2007 and he has a diagnoses of osteoarthritis, seizure disorder, and schizoaffective disorder (Tr. 755). She explains that Plaintiff is incapable of even "low stress" jobs because increased stress worsens his anxiety (Tr. 756).

M.W. DiFonso, Psy. D. evaluated Plaintiff on October 22, 2019 (Tr. 906-918). In this evaluation, Dr. DiFonso details that Plaintiff alleges disability due to bad knees; arthritis in his back, hips, neck, and knees; osteoporosis; migraines; seizures; schizophrenia; severe depression; poor memory; and COPD (Tr. 909). Dr. DiFonso reports that Plaintiff is experiencing less seizures and migraines on his new medication, with Plaintiff only having two seizures and one migraine in the last three months prior to the evaluation (Tr. 913). Ultimately, Dr. DiFonso found Plaintiff to be not disabled (Tr. 918).

Howard Tin, Psy. D., re-evaluated Plaintiff on March 16, 2020 (Tr. 919-933). Dr. Tin evaluated Plaintiff at the reconsideration level. He explained that "claimant alleged no changes in condition and no new illnesses or injuries" but has a recent suicide attempt in December 2019 as well as "significant ongoing psychosocial stressors" (Tr. 924). Dr. Tin indicates that Plaintiff has a number of severe disorders, including spine disorders; major joints dysfunction; epilepsy; migraines; anxiety and obsessive-compulsive disorders; depressive, bipolar, and related disorders; and personality disorders (Tr. 924). Dr. Tin briefly discusses Plaintiff's seizures, and explains that a recent MRI is "essentially normal" (Tr. 927). Plaintiff is taking new medications, including Depakote, and reporting less seizure activity and migraines (Tr. 927). Specifically, Plaintiff suffered from 2 seizures and 1 migraine in the last 3 months (Tr. 927). Ultimately, Dr. Tin found Plaintiff to not be disabled (Tr. 932).

## Analysis

In this appeal, Plaintiff advances two main arguments in support of his contention that remand is appropriate. Plaintiff first argues that the ALJ's analysis of whether he met a Listing at step three was erroneous. He argues that his seizures and migraines meet the requirements of Listing 11.02. Plaintiff's second argument is that the ALJ failed to develop the RFC to account for his seizures and migraines. The Court begins its analysis with Plaintiff's first argument because a finding for Plaintiff on this argument warrants remand.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. The Listings are found at 20 C.F.R.

Pt. 404, Subpt. P, App. 1. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that he meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The 11.00 series of the Listings cover congenital disorders that affect multiple body systems. As relevant here, Listing 11.02 requires:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)

OR

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)

OR

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
   1. Physical functioning (see 11.00G3a); or
   2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
   3. Interacting with others (see 11.00G3b(ii)); or
   4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
   5. Adapting or managing oneself (see 11.00G3b(iv)).

The ALJ said that Plaintiff did not meet the requirements of Listing 11.02 because there is no documentation of seizures that meet the aforementioned requirements (Tr. 773). Plaintiff argues that the ALJ did not properly evaluate his seizure disorder to see if

it met the requirements of Listing 11.02 and that his recitation of Listing 11.02's requirements is the type of "perfunctory analysis" the Seventh Circuit has repeatedly found legally insufficient (Doc. 17, p. 6). Furthermore, Plaintiff pointed to evidence in the record of his seizures that he argues was not addressed or considered by the ALJ. Defendant argues that Plaintiff has the burden of providing evidence of seizures and that the medical records submitted by Plaintiff do not show tonic-clonic seizures that meet the requirements of 11.02 (Doc. 23, p. 5). Ultimately, Defendant argues there is no conflicting evidence where the ALJ needed to reject some medical evidence and discuss it related to the listing criteria in order to come to his decision (Doc. 23, pp. 4-5).

The Court finds Plaintiff's argument persuasive. In reviewing of the record, the ALJ failed to discuss medical evidence favorable to Plaintiff's claim that he met or equaled Listing 11.02. In fact, there are extensive medical records that show that Plaintiff's seizures occur regularly even despite his compliance with medication and treatment as prescribed by his doctors. For example, Plaintiff points to medical records from the Brain & Spine Institute. An April 2014 medical note indicates that Plaintiff has "generalized tonic and clonic seizures" for approximately one year and has had four seizures since February 10, 2013 (Tr. 485). A second medical note on September 2014 indicates that Plaintiff is "currently stable with Keppra 2000 mg daily and Dilantin 300 mg daily. One seizure reported on Sept. 11, 2014" (Tr. 485)

In a February 5, 2015 visit note, Dr. Trivedi indicates that Plaintiff's seizures started in December 2011 and the date of Plaintiff's last seizure was January 11, 2015 (approximately one month before this visit) (Tr. 486). In a visit note from June 23, 2015,

Dr. Trivedi indicated that Plaintiff's last seizure was January 11, 2015 and the problem is "recurrent" (Tr. 482). The medical note also details that the type of seizure Plaintiff has is "complex partial," but medications provide "good results" (Tr. 482).

In a visit note from February 4, 2016, Dr. Golombievski records that Plaintiff's symptoms began around 3 years ago (in 2013) and his symptoms are varying, "incapacitating," and "occur randomly" (Tr. 477). Furthermore while medication helps relieve his symptoms, Plaintiff "states the symptoms are chronic and are uncontrolled" (Tr. 477). Dr. Golombievski describes hat Plaintiff's seizures happen approximately once a month (Tr. 477). While an MRI from 2012 was normal, Plaintiff also reports a long history of migraines (Tr. 477).

Plaintiff filled out a seizure description form, filled out by his ex-wife, in which she says she witnessed seizures starting in February 2013 until the present (Tr. 371). She indicated that she witnessed "many" and "lost count," but that he generally has more than one a month (Tr. 371).

Dr. Hanson, who Plaintiff testified at the hearing was his current doctor, filled out a Seizure Disorders Questionnaire on February 25, 2016 (Tr. 500-501). Dr. Hanson indicates that Plaintiff has been diagnosed with epilepsy and is prescribed medications for these seizures, which he is complaint in taking, but that he still has monthly seizures (Tr. 500). She filled out a second Questionnaire on February 18, 2016, in which she reiterates that Plaintiff is compliant with his seizure medication, but that it causes dizziness, eye focusing problems, and double visitation (Tr. 503). She also indicates that Plaintiff has recurring seizures during which he loses consciousness (Tr. 502).

Dr. Adrian Feinerman, MD, who performed a physical examination on Plaintiff as a consultative examiner, noted that Plaintiff has "tonic clonic seizures for the past 4 year which occur about once a month. The last seizure was 10 days ago" (Tr. 564). This examination occurred on July 21, 2016 and was cited to by the ALJ in his decision, with the ALJ mainly relying on this examination to describe Plaintiff's mobility without mention of Dr. Feinerman's findings on Plaintiff's seizures (Tr. 564, 782). The ALJ did include that Plaintiff's diagnoses at the examination "included seizures, lumbar, disc disease, and degenerative joint disease," but did not discuss Plaintiff's seizures or Dr. Feinerman's findings beyond this (Tr. 782).

Even as time went on, the record indicates that while Plaintiff's seizures may have become less frequent due to changes and increases in his medication, he still had regular seizures. In March 2019, he was still reporting 1-3 seizures a month (Tr. 1831). At the hearing in 2020, Plaintiff testified that he was still having 1-3 seizures a month, which was less than he normally had, because of an increase in his medications (Tr. 822). These reports are also consistent with the description forms filled out by Plaintiff's friends and family as to how often he has seizures and the impact of his seizures on him (Tr. 371-373; 389). In the ALJ's discussion of why Plaintiff does not meet the requirements of Listing 11.02, he does not discuss any of the evidence and does not give a reason why the evidence does not support finding Plaintiff disabled.

An ALJ is not required to discuss every piece of evidence in the record, but, at the same time, the ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore*, 743 F.3d at 1123,

collecting cases. That is what the ALJ did here. There is extensive evidence in the record that Plaintiff suffers from seizures that persist despite medications and treatment.[7] The ALJ failed to assess how this evidence factors into his decision to determine that Plaintiff did not meet the 11.02 Listing. The purpose of the ALJ is to "build an accurate and logical bridge between the evidence and the result." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). Here, the ALJ failed to meet that burden by discussing the Listings in an "impermissibly perfunctory" fashion. *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015). In *Minnick*, the ALJ's "analysis" consisted only of the statement that "The evidence does not establish the presence" of the Listing's requirements. The Seventh Circuit called this "the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *Minnick*, 775 F.3d at 935-936. The ALJ in *Minnick* also failed to discuss relevant medical evidence. "We cannot discern from the ALJ's scant analysis whether she considered and dismissed, or completely failed to consider, this pertinent evidence. If the ALJ did consider and dismiss some or all of this evidence, she never so stated." The Seventh Circuit held that the ALJ failed to build the

---

[7] Oddly, the ALJ acknowledged this evidence briefly in his reasoning at Step 5 when explaining Plaintiff's RFC. He wrote, "The record regarding his physical health shows that the claimant received treatment with the Brain and Spine Institute for his seizures, and followed up on June 23, 2015 (Ex. C2F/1-4). He was compliant with his medications, and his examination was within normal limits. His diagnosis was epilepsy. He has had generalized **tonic clonic** seizures. He was stable. He underwent a brain MRI on February 26, 2016, hat showed no evidence of acute hemorrhage, hydrocephalus, or mass effect" (Tr. 781). He further summarizes some of the medical records and writes, "His diagnoses included headache, migraines features, and unspecific convulsions, suspected to be non-epileptic but also possibly epileptic per history" (Tr. 781). The ALJ cited to Plaintiff's medical records to conclude that Plaintiff's seizures became less frequent, which Plaintiff reported, but he was still reporting as of January 2020 that his seizures were occurring, on average, about one time per month or slightly less (Tr. 822; 823; 1831). But even though they were becoming less frequent, the ALJ failed to discuss how Plaintiff's seizures and migraines may impact him and his ability to work. And ultimately, this was at Step 5, not 3, and thus the ALJ failed to assess how this type of evidence factors into his decision to determine that Plaintiff did not meet the 11.02 Listing.

required "logical bridge" from the evidence to her conclusion. *Minnick*, 775 F.3d at 936. The same is true here.

Because of the ALJ's errors, this case must be remanded; therefore, it is unnecessary to consider the rest of Plaintiff' s arguments regarding whether the ALJ failed to evaluate Plaintiff's RFC to account for his seizure disorder. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**
**DATED: September 29, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**